UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TOYIN ALONGE,

          *Petitioner,*

      -against-

P. CHAPPIUS, JR., Superintendent,
Elmira Correctional Facility,

          *Respondent.*
----------------------------------X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ APR 16 2019 ★
BROOKLYN OFFICE

**MEMORANDUM & ORDER**
12-CV-542 (KAM)

**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

     *Pro se* petitioner Toyin Alonge ("petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions of Robbery in the First Degree, Attempted Robbery in the First Degree, and Coercion in the First Degree, for which he was sentenced to ten years' imprisonment. (*See* ECF No. 1, Petition for Writ of Habeas Corpus ("Pet.") 1.[1]) Petitioner is currently under supervised release pursuant to his sentence imposed in the Supreme Court of the State of New York in Kings County. (*Id.*) For the reasons set forth below, the petition is denied.

---

[1]    Citations to the petition refer to the pagination as designated by the court's Electronic Case Filing ("ECF") system. All other record citations, unless indicated otherwise, refer to original pagination.



## BACKGROUND[2]

### I.  Factual Background

#### A.  Incident on January 4, 2006

Around 6:00 a.m. on January 4, 2006, Blondine Jean-Baptiste left her home for work. (ECF No. 7-1, Resp. to Order to Show Cause, Ex. A, Transcript of State Court Trial ("Tr.") 31.) As she was walking to the train station, she saw a young man approaching her, so she put her head down and quickened her pace. (*Id.* at 32.) The man appeared directly in front of her and began asking her questions. (*Id.* at 33.) Jean-Baptiste moved away from him and toward the train station, and the man followed her. (*Id.* at 34.) As she crossed the street, he cut her off and pulled out a knife while standing about five to nine inches away from her. (*Id.* at 34, 70-71.) He told her to turn around slowly and not to scream. (*Id.* at 34.) Although the sun had not yet risen,[3] Jean-Baptiste testified that she was able to see the man's eyes and forehead. (*Id.* at 40.) He wore a ski mask covering the lower part of his face, and a black North Face jacket with a hood. (*Id.* at 35.) Jean-Baptiste believed the man to be between 18 and 22 years old. (*Id.*)

---

[2]     The following summary of facts and procedural history is primarily compiled from the parties' submissions and petitioner's hearing and trial transcripts in New York State Supreme Court.

[3]     At trial, petitioner requested the trial court take judicial notice that the sun rose at 7:20 a.m. on January 4, 2006 in Brooklyn, New York. (Tr. 314; *see also* ECF No. 28, Reply in Opp'n to Resp't's Aff. ("Reply") 15.)

2

The assailant demanded Jean-Baptiste's money, cell phone, and jewelry; she complied. (*Id.* at 36.) He held her arm as they walked side-by-side down the street. (*Id.* at 39.) He led her down a short flight of stairs, consisting of three steps, into a building's basement, which was lit by a single light bulb. (*Id.* at 37-38, 41.) The assailant stood directly in front of Jean-Baptiste, within arm's reach, when he threatened to rape her if she had not given him at least $50. (*Id.* at 37, 41, 70.) She responded that he would have to kill her. (*Id.* at 37.) Jean-Baptiste pushed the assailant away after he touched her face, and he said he would use his knife. (*Id.* at 37, 83.) She pushed him again and ran up the stairs to the train station. (*Id.* at 37.) Jean-Baptiste went to work afterward, but soon asked her supervisor to leave early because she was still shaken from the incident. (*Id.* at 43-44.) She went to the 70th Precinct police station later that day to report the incident and provided a description of her assailant to a police officer on duty. (*Id.* at 44-45.) Jean-Baptiste described his height as between 5'10" and 6'0", and his weight as between 150 and 160 pounds. (*Id.* at 45, 96.)

On January 5, 2006, Detective Lamar received Jean-Baptiste's case and called Jean-Baptiste to ask her about the previous day's events. (ECF No. 7-1, Resp. to Order to Show Cause Ex. A, State Court *Wade* Hearing ("WH Tr.") at 14.) She

3

described her assailant to Detective Lamar as an approximately 19-year-old black male, wearing a black North Face jacket with a hood and a ski mask covering the lower part of his face. (*Id.* at 17, 47.)

### B. Incident on January 6, 2006

At approximately 12:30 a.m. on January 6, 2006, Yafah Stuger was walking home from work when a man approached her from behind. (Tr. 119-23.) The area was mostly dark, but there was a well-lit reception hall on the side of the street where she was walking. (*Id.* at 122.) As the man got closer, Stuger moved to cross to the opposite side of the street, but the man followed her. (*Id.* at 123.) He grabbed her hand and told her that he had a knife and would stab her if she made a sound. (*Id.* at 123-24.) The man asked Stuger where her money was, and she replied that she had none. (*Id.* at 125.) He once again told her he would stab her if she made any sound. (*Id.*)

The assailant held Stuger's arms and searched her pockets as he led her down the street, with his knife visible to Stuger. (*Id.* at 126-27.) While walking, he asked her questions, including where she worked, where she lived, whether she had a boyfriend, and whether she was enrolled in school; she answered his questions. (*Id.* at 130.) She also told him that he could not rape her because she was then menstruating. (*Id.* at 134.) Although Stuger was unable to see her assailant's

4

hairline or the top of his head because he had his hood up, she was able to hear his voice and see his eyes and hands while they walked. (*Id.* at 126, 131, 183-84.) She noticed that his hands were very thin. (*Id.* at 131.)

The assailant led Stuger into the lighted foyer of an apartment building, where he stood directly opposite her. (*Id.* at 130-32.) He led Stuger up a flight of stairs and into an elevator, where she was again able to view the assailant in well-lit, close proximity. (*Id.* at 133.) While in the elevator, he told her that he wanted to see whether she had lied about menstruating. (*Id.* at 134.) They alighted on the sixth floor and took the stairs to the roof of the building. (*Id.* at 135-36.) He told her that he would stab her if she did not remove all her clothing. (*Id.* at 136.) After Stuger removed her clothing, the assailant told her to turn around, and she heard him rifling through his pockets. (*Id.* at 139.) Stuger then observed the man return down the stairs and enter the elevator. (*Id.* at 140.)

After the elevator began to descend, Stuger left the roof to seek help by knocking on apartment doors and asking building residents to call 911. (*Id.* at 143.) When a police officer arrived at the apartment building, Stuger recounted the events and provided a description of her assailant as a man with a black North Face jacket, dark blue or black jeans, blue and

white sneakers, and a face mask covering his nose and mouth.
(*Id.* at 144-45.) According to the police report, the incident
is estimated to have occurred from 1:00 a.m. to 1:14 a.m.
(Reply 12.)

On January 8, 2006, Stuger spoke with Detective
Christopher Lamar about the incident. (Tr. 145, 215-16.) She
gave the same description of the assailant's clothing. (*Id.* at
146.) She also recalled that he was approximately 6'0" or 6'1"
tall, very slim, black, and approximately 19 or 20 years old.
(*Id.* at 147-48.)

### C. Incident on January 8, 2006

On January 8, 2006, Officer Jermaine Clark and his
partner were working a night shift and patrolling the 70th
Precinct, where Jean-Baptiste's and Stuger's incidents had been
reported. (WH Tr. 126, 128.) At approximately 1:30 a.m., the
officers noticed petitioner following a woman and believed that
he fit the description of the assailant in Jean-Baptiste's and
Stuger's cases. (*See id.* at 129-30.) The assailant had been
described to the officers as a black male, age 18 to 21, 5'10"
to 6'0" tall, wearing a black North Face jacket, and armed with
a knife. (*Id.* at 128.) When petitioner saw the officers
driving by, he ducked behind a van, then emerged from behind the
van when the officers passed him. (*Id.* at 129.) Officer Clark
got out of the police vehicle and approached petitioner. (*Id.*)

The woman who petitioner had been following appeared frightened and expressed relief at the officers' arrival. (*Id.* at 130-131.) Officer Clark asked petitioner for identification, but petitioner said he had none. (*Id.* at 129-30.) Upon frisking petitioner and discovering a knife in his pocket, Officer Clark arrested petitioner. (*Id.* at 132-35.)

### D. The Lineup Identifications

Later on January 8, Detective Lamar, who was handling Jean-Baptiste's and Stuger's cases, sought to conduct a lineup. (Tr. 217.) In preparation, his partner, Detective Lee, went to a Brooklyn house shelter to pick fillers for the lineup. (*Id.*) Detective Lee had seen petitioner beforehand and had agreed to find fillers that resembled him. (*Id.* at 236.) Detective Lamar testified that Detective Lee chose to go to the shelter because there were many people from whom to choose fillers similar to petitioner. (WH Tr. 97.) Detective Lamar testified that petitioner appeared to be approximately 20 years old at the time of the lineup. (Tr. 236.) At the shelter, Detective Lee found fillers aged 34, 29, 20, 36, and 35. (*Id.* at 238-43.) Detective Lamar stated that he was satisfied with the resemblance of the fillers to petitioner with respect to their weight, height, complexion, and overall appearance. (*Id.* at 266.)

Detective Lamar picked up Jean-Baptiste and Stuger and informed them that they would be viewing a lineup of several suspects.[4]  (*Id.* at 148, 190-91, 217.)  He instructed them not to speak to each other in the car.  (*Id.* at 218.)  Although Jean-Baptiste and Stuger rode in the car together, they did not speak, and Stuger did not know who Jean-Baptiste was at the time.[5]  (*Id.* at 148-49.)

After they arrived at the precinct, Detective Lamar escorted Jean-Baptiste and Stuger to his supervisor's office to wait while he reviewed the lineup fillers.  (*Id.* at 219.) Detective Lamar looked at the physical appearance of the fillers and then asked petitioner what position he wanted to take in the lineup.  (*Id.* at 221.)  Petitioner chose to be in the fifth position.  (*Id.*)  Detective Lamar gave the lineup participants hats to wear and bandannas to cover the lower half of their faces.  (*Id.* at 221, 223.)  Detective Lamar used the hats to disguise any differences in the lineup participants' hairstyles. (WH Tr. 104.)  He instructed petitioner to ensure that his hands

---

[4]     According to Stuger's trial testimony, Detective Lamar explained that Stuger and Jean-Baptiste would view a lineup of several potential suspects. (Tr. 190-91.)  Jean-Baptiste recalled that Detective Lamar told her that he had a few men for her to view to determine whether one might be her assailant.  (*Id.* at 48.)  At petitioner's *Wade* hearing in May 2007, prior to trial, Detective Lamar testified that he informed the complainants that he believed the person that had committed the crime against them was in custody. (WH Tr. 107; Tr. 264.)  At trial, Detective Lamar testified that he had been confused during the hearing and confirmed that he did not believe he had the perpetrator in custody prior to the lineups.  (Tr. 263-65.)
[5]     Stuger testified that she learned of a second complainant at the grand jury hearing a few days after the lineup.  (*Id.* at 170.)

were visible because each complainant saw her assailant's hands. (Reply 4-5.)

Detective Lamar told the complainants that he would perform a sequential lineup for each of them. (Tr. 224.) Stuger observed the line-up first; Detective Lamar positioned her in front of a door with a one-way mirror, called a hatch, and instructed her to inform him of anyone she recognized. (*Id.* at 150, 224.) Detective Lee, who was in the room with the lineup participants, would open the hatch each time Detective Lamar knocked on the window, thereby revealing one lineup participant at a time to Stuger. (WH Tr. 32.) The hatch opened once for each participant in the lineup.[6] (*Id.*) Detective Lamar testified that when Stuger saw petitioner in the fifth position in the lineup she began to shake, backed up from the viewing window, and stated that petitioner was her attacker. (*Id.*)

---

[6]    Stuger testified that the hatch opened a total of five times and she viewed only the first five participants in the lineup. (*Id.* at 151, 188.) However, both Detective Lamar and petitioner appear to contradict Stuger's testimony, each claiming that Stuger viewed a visual lineup followed by a voice lineup of all six participants. (*Id.* at 225; Pet. 16-17.) Petitioner appears to contend in his Reply brief that Stuger's failure to view all six participants in the lineup rendered the lineup unduly suggestive. (*See* Reply 12.) First, the law of the Second Circuit dictates that courts are not to consider arguments raised for the first time in a reply. *Stoeckley v. Cty. of Nassau*, No. 15-CV-514, 2015 WL 8484431, at *1 (E.D.N.Y. Dec. 9, 2015) (citing *Mullins v. City of New York*, 653 F.3d 104, 118 n.2 (2d Cir. 2011)) (declining to consider argument raised for the first time in a reply brief). Second, this argument finds no basis in clearly established federal law. *Cf. United States ex rel Whitmore v. Malcolm*, 476 F.2d 363, 368 (2d Cir. 1983) (declining to find lineup unduly suggestive where police did not insist witness continue with show-up after becoming visibly distraught upon first recognizing and positively identifying her suspected assailant).

9

There was a brief period between the visual and voice identification lineups. (*Id.* at 68.) Detective Lamar did not ask petitioner whether he would like to change his position in the lineup before conducting the voice identification. (Tr. 249.) Detective Lamar testified that Stuger did not know whether the lineup participants would change positions for the voice identification. (WH Tr. 66.) During the voice identification, the hatch was opened as each participant said what Stuger reported to the police that her assailant told her, "Don't make a move, don't make a sound because I have a knife."[7] (*Id.* at 35.) Stuger intermittently opened and closed her eyes while she listened and asked some of the lineup participants to repeat their statement. (*Id.* at 36, 69, 72.) All the lineup participants except for petitioner spoke clearly and loudly. (Tr. 152.) Stuger was unable to hear petitioner when he first spoke during the voice identification, and she told Detective Lamar that she could not hear him. (*Id.*) Petitioner was instructed to speak louder and look ahead. (*Id.*) When he did so, Stuger identified him as the man who had attacked her; she began shaking and appeared nervous. (*Id.* at 151-52; WH Tr. 36.) In addition to recognizing petitioner's voice during the lineup,

---

[7] Stuger testified that she believed the lineup participants said, "Don't make a sound or I will stab you." (*Id.* at 151.) At trial, Detective Lamar recalled that the statement was, "Don't move, don't make a sound, I have a knife." (*Id.* at 226.)

Stuger said she also recognized petitioner's eyes and his hands, which she saw because he was holding up his number during the lineup. (Tr. 152.) Stuger's lineup concluded at 7:15 p.m. (WH Tr. 119.)

Before beginning the lineup procedure for Jean-Baptiste, Detective Lamar testified that he asked petitioner whether he wanted to change his position in the lineup, but petitioner chose to remain in the fifth position.[8] (Tr. 228.) Detective Lamar then began the lineup for Jean-Baptiste. (*Id.* at 226.) Jean-Baptiste first viewed the visual lineup. (*Id.* at 90.) The hatch opened up and she saw each lineup participant. (*Id.* at 90-91.) When Jean-Baptiste viewed petitioner in the fifth position, she started to shake and identified him as her assailant. (*Id.* at 92, WH Tr. 49.) During the voice identification, Detective Lamar testified that Jean-Baptiste closed her eyes to focus. (WH Tr. 50.) Each lineup participant said words that Jean-Baptiste reported to the police: "Now that you have less than 50 dollars, you have to fuck me."[9] (Tr. 226.) When petitioner spoke, Jean-Baptiste testified that she thought he was changing his voice, but that his voice sounded familiar. (*Id.* at 51, 97; WH Tr. 50.) She testified that, upon hearing

---

[8]    Petitioner contends that Detective Lamar did not ask whether petitioner wanted to change his position after Stuger's voice lineup. (Pet. 16.)
[9]    Jean-Baptiste recalled that the statement was, "If you don't have more than 50 dollars, I'm going to fuck you." (*Id.* at 49.)

petitioner speak, she felt her stomach turn and her heartbeat quicken. (Tr. 97.) When petitioner spoke more clearly, Jean-Baptiste backed away from the window and Detective Lamar caught her as her knees buckled. (WH Tr. 51.) Jean-Baptiste told Detective Lamar that petitioner, standing in the fifth position, was her attacker. (*Id.*) Jean-Baptiste's lineup concluded at 7:30 p.m. (*Id.* at 119.)

After Jean-Baptiste and Stuger conducted their individual lineup identifications, Detective Lamar placed petitioner under arrest. (Tr. 233-34.) Petitioner was charged with committing crimes against both complainants in a single indictment, and the two cases were heard and tried together. (WH Tr. 5.)

## II. Petitioner's May 2007 *Wade* Hearing and August 2007 Trial

Prior to the jury trial, petitioner, represented by counsel, requested a *Wade* hearing to contest the admission of the lineup identification procedures on the basis that they were unduly suggestive. (*See id.* at 192.) After the hearing, the trial court denied petitioner's efforts to suppress the lineup identification evidence and found that "[t]he People met their burden of showing that the police conduct was reasonable and the procedures were not unduly suggestive." (ECF No. 7, Resp't's Opp'n to Pet. for a Writ of Habeas Corpus ("Opp.") 9-10; ECF

No. 7-2, Ex. G, *Wade* Hearing Decision & Order ("Wade Order") 5.)
The trial court also found that petitioner was not highlighted
during the visual lineup, and that the lineup was not tainted
based on petitioner remaining in the fifth position during the
voice identification. (*Id.* at 10.)

Petitioner's trial commenced on August 9, 2007. (*Id.*;
*see also* Tr. 1.) At trial, Jean-Baptiste identified petitioner
as her attacker. (Tr. 35.) Upon cross-examination by
petitioner's counsel, Jean-Baptiste testified that she
recognized his eyes, despite 18 months having passed since she
last saw petitioner. (*Id.* at 74.) Stuger also identified
petitioner as both the person in the fifth position in the
lineup and the person who had attacked her on January 6, 2006.
(*Id.* at 150.)

The jury found petitioner guilty of committing Robbery
in the First Degree against Jean-Baptiste, and Attempted Robbery
in the First Degree and Coercion in the First Degree against
Stuger. (Opp. 10.) The trial court entered a judgment of
conviction on August 16, 2007. (Pet. 2.) Petitioner was
sentenced on October 1, 2007, to concurrent prison terms
totaling ten years of imprisonment, followed by five years of
post-release supervision. (*Id.*; Opp. 10.)

### III. Post-Conviction Proceedings in State Court

Petitioner, again represented by counsel, on December 23, 2009, appealed his conviction to the New York State Supreme Court's Appellate Division, Second Department, challenging the admission of lineup identification evidence on the basis that it was unduly suggestive.[10] (App. Br. 15-20.) The Appellate Division unanimously affirmed the trial court's conviction by decision and order dated June 29, 2010. *See People v. Alonge*, 74 A.D.3d 1354 (N.Y. App. Div. 2010). Petitioner's counsel petitioned for leave to appeal, but was denied on November 3, 2010. *People v. Alonge*, 939 N.E.2d 811 (N.Y. 2010).

### IV. The Instant Habeas Petition

Proceeding *pro se*, petitioner filed the instant habeas petition on January 30, 2012, alleging that the lineup identification procedures were unduly suggestive. (*See* App. Br. 15; Pet. 6, 16.) Specifically, petitioner objects to the age range of the fillers used in the lineup and the fact that the witnesses were able to view the lineup a second time during the voice identification. (Pet. 16-17.)

---

[10]    On appeal, petitioner was represented by Brian Dratch, Esq. (*See generally* ECF No. 7, Ex. B, Defendant's Main Appellate Division Brief ("App. Br.").)

## STANDARD OF REVIEW

A habeas petition under 28 U.S.C. § 2254 shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014). A habeas petitioner's state remedies are considered exhausted when the petitioner has: "(i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Attorney Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001); *see also Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) ("To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'" (quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990))).

Where a claim has been exhausted, the state court's adjudication on the merits is entitled to deference on collateral review. *See Renico v. Lett*, 559 U.S. 766, 767 (2010)

("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that [they] be given the benefit of the doubt." (internal citations and quotation marks omitted)). Thus, a federal court may only grant habeas relief where the state court's adjudication of the federal claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Clearly established federal law is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., concurring). A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

16

that principle to the facts of the prisoner's case." *Id.* The Supreme Court has emphasized that the reasonableness of the application of federal law is to be assessed objectively rather than subjectively. *Id.* at 409-10; *see Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

To ascertain whether a state court has based its decision on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), the Supreme Court has looked to whether the evidence "can fairly be read to support the [court's] factual determination." *Wood v. Allen*, 558 U.S. 290, 301-02 (2010). Factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.* at 301. The reviewing court might find an unreasonable factual determination "where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding," *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)), "or

where the court ignored highly probative and material evidence,"
*id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)).

In reviewing the petition, the court is mindful that a "document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted); *see also Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) ("[D]ue to the *pro se* petitioner's general lack of expertise, courts should review habeas petitions with a lenient eye[.]"). Thus, the court must interpret petitioner's pleadings as raising the strongest arguments they suggest. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).

## DISCUSSION

Here, it is undisputed that petitioner exhausted his claims of unduly suggestive lineup procedures in state court and timely filed his petition under the applicable one-year statute of limitations. Accordingly, this court need only determine whether the state court reasonably applied clearly established federal law when rejecting petitioner's claims of unduly suggestive lineup procedures and made reasonable factual determinations regarding the fillers in the lineup.

The court will conduct a sequential inquiry to determine whether in-court identification evidence based on pretrial identification procedures may be admitted: the court will consider first, "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator[;]" and second, "whether the identification was nonetheless independently reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001); *see* also *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012). These questions "must be evaluated in light of the totality of surrounding circumstances." *Simmons v. United States*, 390 U.S. 377, 383 (1968).

In finding that the lineup procedures were not unduly suggestive and admitting as evidence the witness identifications, the state court did not unreasonably apply federal law or make unreasonable factual determinations based on evidence in the state court proceeding. Furthermore, the independent reliability of the witnesses' testimony guards against "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Therefore, this court declines to grant federal habeas relief for petitioner's claims of unduly suggestive lineup procedures.

## I. Lineup Procedures

The state court did not unreasonably apply federal law in determining that the discrepancy in age between petitioner

and four of the five fillers, and the witnesses' visual access
to the lineup during the voice identification, did not
constitute an unduly suggestive procedure.

### A.    The Age Range of the Fillers

Petitioner first challenges the identification lineup
on the ground that the ages of four of the five lineup fillers
varied too greatly from his own.   (Reply 9.)

The Supreme Court has held that due process is met for
a defendant in a pretrial identification lineup process unless
that lineup is "so impermissibly suggestive as to give rise to a
very substantial likelihood of irreparable misidentification."
*Simmons*, 390 U.S. at 384.   The Second Circuit has noted that
"[t]he Supreme Court has found lineups to be impermissibly
suggestive only under extreme circumstances."   *Perkins v. Comm'r
of Corr. Servs.*, 218 F. App'x 24, 25 (2d Cir. 2007).   Although
lineups may be unduly suggestive where "the defendant is the
only participant who meets the particular description of the
perpetrator given by eyewitnesses," federal law does not mandate
"total uniformity of appearance."   *Piper v. Portuondo*, 82 F.
App'x 51, 52 (2d Cir. 2003); *see Solomon v. Smith*, 645 F.2d
1179, 1183 (2d Cir. 1981) (lineup was unduly suggestive where
each filler's height, weight, or both, failed to meet the
witness's description); *Daniels v. New York*, No. 07-CV-0448,
2009 WL 2602267, at *14 (E.D.N.Y. Aug. 21, 2009) ("Although some

of the fillers were older and heavier than Petitioner, . . .
Petitioner did not so obviously stand out from the lineup
fillers so as to create a substantial likelihood of
misidentification."). "The critical question is whether a
defendant's appearance made him 'so [stand] out' from the others
in the lineup as to suggest unfairly that he 'was more likely to
be the culprit.'" *Piper*, 82 F. App'x at 52 (quoting *Jarrett v.*
*Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). Because it would be
unduly burdensome to require police officials to find five or
six very similar individuals for a lineup, a reasonable effort
to harmonize the lineup is normally all that is required.
*Gossett v. Henderson*, No. 87-CV-5878, 1991 WL 135601, at *2
(S.D.N.Y. July 18, 1991).

Petitioner's sole basis for claiming that the visual
lineup was unduly suggestive is the difference between his age
at the time of the lineup and the ages of four of the five
fillers. (Pet. 16.) No claim is made with respect to any other
physical characteristics of the fillers. Based on the trial
testimony and photographs of the participants in the lineup,
including petitioner, this court agrees with the Appellate
Division's finding that "[t]he photographs taken of the lineup
reflect that the age disparities between the defendant and the
fillers were not so apparent as to orient the viewer toward the
defendant as a perpetrator of the crimes charged." *Alonge*, 74

21

A.D.3d at 1354 (internal quotation marks omitted). Trial testimony showed that Detectives Lamar and Lee made reasonable efforts to ensure a similar appearance among the lineup participants. Detective Lee sought fillers from a shelter that housed many people in order to select participants who resembled petitioner. Detective Lee ultimately recruited fillers that he and Detective Lamar believed to resemble petitioner in overall appearance, including height, weight, and complexion. (*See* Tr. 266.) Detective Lamar had the participants wear hats and handkerchiefs to hide their different hairstyles and the lower half of their faces. (*See id.* at 221, 223.) Furthermore, petitioner's claim of an age disparity does not apply to all of the fillers in the lineup, as one filler was 20 years old. (*Id.* at 238-43.)

Age may be a helpful metric for finding apparently similar fillers, but it is not dispositive. That is, a lineup full of 20-year-old fillers, even of similar race and build to petitioner, would not necessarily have ensured a constitutional lineup for petitioner. Individuals age differently. Moreover, only the minimal area surrounding the eyes of the lineup participants' individual faces was visible, and was hardly enough to reveal the relative age of each lineup participant. Indeed, the *Wade* hearing court based its decision in part on a comparison of the photographs of the lineup participants, and

22

concluded that petitioner was not highlighted relative to the fillers, including on account of his apparent age. (Wade Order 5.) In light of the reasonable efforts shown by the detectives to harmonize the lineup, and considering that petitioner was not apparently highlighted by his difference in age from the lineup fillers, the state court's conclusion is not an unreasonable application of clearly established federal law.

## B. Visual Observation During the Voice Identification

Petitioner also challenges the lineup procedures on the ground that the complainants' ability to view the lineup participants during the voice identification portion rendered the lineup unduly suggestive. (Reply 9-10, 18.) Under a liberal interpretation of petitioner's legal arguments, petitioner appears also to challenge his repeated place in the fifth position in both the visual and voice identification lineups.[11] (*See id.* at 17-18.)

Several courts have held that conducting voice identifications in a manner such that the witness cannot see the speakers, coupled with other factors, supports a finding that identification procedures were not suggestive. *Newton v. Coombe*, No. 95-CV-9427, 2000 U.S. Dist. LEXIS 21106, at *41-42

---

[11]  Petitioner did not raise this argument in his initial petition, but at least mentions it in his Reply. As discussed above, courts are not to consider arguments raised for the first time in a reply. *Stoeckley*, 2015 WL 8484431, at *1.

(S.D.N.Y. Dec. 7, 2000). However, courts have not held that the witness's ability to simultaneously see the speakers is a fatal flaw. *Id.* (holding that a voice lineup was not unduly suggestive despite "the witness [having] simultaneous access to multiple physical characteristics of a suspect"); *see also Long v. Donnelly*, 335 F. Supp. 2d 450, 460 (S.D.N.Y. 2004) (upholding a voice identification, challenged on other grounds, where "each witness viewed the lineup in isolation; each witness was taken to a separate room as they waited; the 'fillers' in the lineup were sufficiently similar; and each lineup participant was instructed to repeat the same scripted phrase").

When multiple identifications are made, a suspect retaining the same position or number in each lineup does not necessarily render the lineups unduly suggestive where the number did nothing more than "provide a neutral label for the witnesses." *See Weay v. Haponick*, No. 05-CV-3866, 2012 WL 70584, at *4 (E.D.N.Y. Jan. 5, 2012) (finding meritless petitioner's claim that a lineup was unduly suggestive "because the accused was identified by the same number in an earlier photo array"); *but see Clerkin v. Bartlett*, No. 90-CV-1368, 1990 WL 252283, at *8 (E.D.N.Y. Dec. 31, 1990) (finding meritless ineffective assistance of counsel claim because counsel did not object to a voice identification in which petitioner was the third person to speak after being the third person seated in a

visual lineup, noting that petitioner was actually seated fourth from the right and was holding a number "6").

Petitioner maintains that the voice identification lineup was unduly suggestive because the complainants were able to view the lineup while the participants read their scripted statement aloud. Because the Supreme Court had not addressed this issue specifically, there was no clearly established federal law at the time the state court rendered its decision regarding whether a witness may view a lineup during a voice identification procedure. *See Newton*, 2000 U.S. Dist. LEXIS 21106, at *41-42. Given that "the Supreme Court has ruled on the general due process boundaries of pre-trial identifications[,] the question presented is thus whether the state courts' resolution of this case was an unreasonable application of those principles." *Watkins v. Perez*, No. 05-CV-477, 2007 WL 1344163, at *13 (S.D.N.Y. May 7, 2007). Here, the state court's finding that the voice identification did not create "a very substantial likelihood of irreparable misidentification" was not an unreasonable application of federal law. Other factors of the lineup, including the complainants' lack of interaction and independent viewing of the lineup, the sufficient similarity of the fillers, and the use of the same scripted phrase, mitigate the likelihood of misidentification.

As discussed above, the court need not consider petitioner's argument, raised in his reply, that the lineup was unduly suggestive because he remained in the fifth position for both the visual and voice identification lineups. However, the court will address this argument nonetheless and finds there is similarly no direct guidance in Supreme Court precedent. Even if the complainants were somehow biased in their selection of petitioner during the voice identification based on their previous identification of petitioner during the visual lineup, the state court's application of federal law in finding that the voice identification did not highlight petitioner was not unreasonable.[12] *See Newton*, 2000 U.S. Dist. LEXIS 21106, at *42 ("To the extent . . . [the victim]'s visual identification of petitioner had some effect on her aural identification, that effect was not the consequence of any conduct by law enforcement that suggested [she] should identify petitioner or that gave petitioner unique prominence."). Indeed, testimony by Detective Lamar and the complainants indicates that it was petitioner who highlighted himself during the voice identification by noticeably concealing, lowering, or disguising his voice. (WH Tr. 35, 50; Tr. 51, 152.) Thus, the state court's admission of the lineup evidence was not contrary to clearly established

---

[12]     The complainants were not told that the lineup participants had remained in the same position, and had no reason to suspect that the participants were not rearranged.  (WH Tr. 66.)

federal law.

Neither the state court's factual determinations regarding the physical appearance of the lineup fillers nor its application of established federal law was unreasonable "beyond any possibility for fairminded disagreement." *See Harrington*, 131 S. Ct. at 787. Therefore, the state court's decision to admit the witness testimony warrants deference, and the reliability of that evidence was properly a matter put to the jury. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

## II. Independently Reliable Identification

Even assuming the voice identification was tainted, which it was not, petitioner cannot succeed on his claims because the witnesses' visual identifications were ultimately independently reliable.

When a lineup procedure may have been unduly suggestive, the Supreme Court has concluded that "reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114. To evaluate the reliability of witness identification, the court considers such factors as the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the

confrontation. *Biggers*, 409 U.S. at 199-200 (holding that a victim's identification was reliable despite a lapse of seven months between the identification and the crime where the victim spent up to half an hour with her assailant, saw him under adequate lighting, and provided a thorough physical description to the police). Absent "a very substantial likelihood of irreparable misidentification," witness testimony is admissible and the reliability of that testimony is a question for the jury. *Manson*, 432 U.S. at 116. Furthermore, "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Rock v. Conway*, 470 F. App'x 15, 17 (2d Cir. 2012) (alterations in original) (internal quotation marks omitted) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the "'unreasonable application' standard is especially deferential where state courts apply open-ended, multifactor tests like that in *Biggers*." *Id.*

Applying the factors in *Biggers*, the complainants' identifications of petitioner are reliable independent of any taint in the pre-indictment visual and voice lineup procedures. Both witnesses were in close contact with their assailant, viewed him face-to-face, at least in part under adequate lighting conditions, and engaged in conversation with him for more than a brief moment. Although the record does not indicate

28

how long Jean-Baptiste's interaction with her assailant lasted, the police report of Stuger's incident estimates that her interaction with her assailant lasted 14 minutes. (Reply 12.) Although their respective attentions were likely focused in part on the threatening interactions with their assailant, both women demonstrated a high degree of certainty during the visual and voice identification lineups, and again at trial. Indeed, Detective Lamar's testimony reveals that, upon seeing and hearing petitioner, both witnesses appeared to have physical and emotional responses. Additionally, a very short time elapsed between the crimes committed against each complainant and the identification: Jean-Baptiste's identification occurred four days after the incident with her assailant, and Stuger's identification occurred only two days after the incident with her assailant.

Petitioner makes several claims disputing the complainants' opportunity to see their assailants during the incidents on January 4 and January 6 and thus challenges their reliability in identifying petitioner. He argues that Jean-Baptiste would not have been able to see her assailant before dawn, and contests the prosecutor's reliance on the light in the basement when it had not been proven to exist. (*Id.* at 15.) The state court's factual determination that Jean-Baptiste could have made out her assailant's features at approximately 6 a.m.

outside and by the light of a bulb in a basement is not
unreasonable, as there is no evidence that the state court
misstated or ignored any material facts in so concluding.
Petitioner also argues that it was impossible for Stuger to have
seen her assailant's eyes because he wore a hood and they walked
side-by-side. (*Id.* at 11.) This argument is contradicted by
Stuger's account of the events, including the time during which
they faced each other in a well-lit elevator, in the lit foyer
of the apartment building, and for a time on the roof-top of the
apartment building.

Petitioner cites to *Raheem v. Kelly*, 257 F.3d 122 (2d
Cir. 2001), in which the Second Circuit stated that "it is human
nature for a person toward whom a gun is being pointed to focus
his attention more on the gun than on the face of the person
pointing it," to support his argument that Stuger would have
focused more on her assailant's knife than on his physical
features. (*Id.*) Petitioner's reliance on that case is
inapposite. In *Raheem*, the Second Circuit noted that the
witnesses were at a bar watching television, chatting, and
drinking alcohol before a commotion broke out involving multiple
gun-wielding strangers, one of whom approached them from behind
and robbed them. Here, the complainants were in close, one-on-
one contact with their assailant, without any of the other
distractions or factors present in *Raheem*.

Each witness's identification of petitioner was therefore independently reliable, regardless of any taint to the lineup procedures.[13] Accordingly, the state court's decision to admit the witness identification evidence was neither contrary to, nor an unreasonable application of, clearly established federal law.

### III. Petitioner's Claim of a Right to Counsel at Identification Lineup

Petitioner also claims that he was entitled to counsel during the lineup. (Pet. 16.) This claim is procedurally barred because petitioner failed to raise the claim in state court and has not shown cause for failing to exhaust his state remedies. *See Bossett*, 41 F.3d at 828-29 (requiring petitioner to show cause where he raised new claims in his federal petition for a writ of habeas corpus). Furthermore, even if the claim were properly before this Court, the claim would fail because the right to counsel does not attach before the initiation of a criminal proceeding. *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008).

Generally, a federal district court should dismiss

---

[13]    Petitioner, and his trial counsel, make much of whether complainants were told that their suspected assailant was in custody or in the lineup they viewed. (Tr. 265; WH Tr. 107; Reply 4.) However, "it is not unduly suggestive for a police officer conducting a lineup to let the witness know that the person suspected of the crime is in fact in the lineup." *United States v. Quashie*, 162 F. Supp. 3d 135, 140 (E.D.N.Y. 2016); *see also Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir. 2007).

petitions that contain claims unexhausted in the state courts.
*See* 28 U.S.C. § 2254(b); *Rose v. Lundy*, 455 U.S. 509, 510
(1982). "[I]f the petitioner no longer has remedies available
in the state courts under 28 U.S.C. § 2254(b)," however, the
claims may be deemed exhausted for purposes of review in federal
court. *Bossett*, 41 F.3d at 828. To achieve review on the
merits of a procedurally barred claim, the petitioner must
"[show] cause for the default and prejudice to the petitioner."
*Id.* at 829 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).
Petitioner may show cause through "a showing that the factual or
legal basis for a claim was not reasonably available to counsel,
. . . or that 'some interference by state officials' made
compliance impracticable, . . . [or that] the procedural default
is the result of ineffective assistance of counsel." *Id.*
(alterations in original) (internal quotation marks omitted)
(quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Petitioner has failed to show any reason that he was
unable to raise in state court his claim of right to counsel
during the identification. He has not claimed that the legal
argument was unavailable, nor that there was any interference by
the state, nor that he was unaware of the argument due to
ineffective assistance of counsel. Regardless, the claim is
without merit, because, as discussed above, the Sixth Amendment
right to counsel "does not attach until a prosecution is

commenced." *United States v. Reed*, 756 F.3d 184, 187 (2d Cir. 2014) (internal quotation mark omitted) (quoting *Rothgery*, 554 U.S. at 198) (finding that the right to counsel may have attached where grand jury had voted a true bill of indictment against the defendant). Because petitioner had not been charged with a crime prior to the lineup, his right to counsel had not yet attached.

## CONCLUSION

For the foregoing reasons, petitioner's application for writ of habeas corpus is denied in its entirety. Because petitioner has not made a substantial showing of the denial of any constitutional right, the court will not issue a certificate of appealability. 28 U.S.C. § 2253; *Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997), *abrogated on other grounds by United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997); *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (discussing the standard for issuing a certificate of appealability). Further, the court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this judgment denying the petition would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). Respondent shall make a reasonable effort to ascertain a forwarding address for petitioner, serve a copy of this Memorandum and Order upon petitioner at his updated address, and file a declaration of

service within three days of the date of this Order. Once

respondent files proof of service, the Clerk of Court is

respectfully requested to dismiss the petition, enter judgment

in favor of respondent, serve the judgment on petitioner at his

updated address, note service on the docket, and close this

case.

**SO ORDERED.**

Dated:      Brooklyn, New York
              April 15, 2019

/s/ USDJ KIYO A. MATSUMOTO

**KIYO A. MATSUMOTO**
United States District Judge